IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

BEAUMONT DIVISION

| | | |
|---|---|---|
| CHRISTOPHER WAYNE ROBIN | § | |
| VS. | § | CIVIL ACTION NO. 1:20-CV-322 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Christopher Wayne Robin, a prisoner confined at the Briscoe Unit of the Texas Department of Criminal Justice, Correctional Institutions Division, proceeding *pro se*, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

The petition was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636 for findings of fact, conclusions of law, and recommendations for the disposition of the case.

Factual Background

Petitioner is in custody pursuant to a judgment entered in the 252nd Judicial District Court of Jefferson County, Texas, in cause number 08-03949. On June 26, 2008, Petitioner was charged with the first degree felony offense of murder, in violation of Texas Penal Code § 19.02(b)(2). The indictment alleged that Petitioner "on or about the 20th day of November, Two Thousand, and Seven . . . did then and there intend to cause serious bodily injury to WAYNE BEAVERS . . . and did cause the death of [Beavers], by committing an act clearly dangerous to human life, to-wit: hitting [Beavers] with unknown objects, his hand and choking [Beavers] with his hand. (ECF No. 17-21 at 5.) The indictment erroneously labeled the offense as a second degree felony. A jury found Petitioner guilty of the first-degree offense of murder. On March 24, 2014, Petitioner was sentenced

to 56 years of imprisonment. The judgment also erroneously labeled the offense as a second degree felony. (ECF No. 17-21 at 6-8.)

Petitioner appealed the judgment. On direct appeal, Petitioner argued that the evidence was insufficient to support his conviction for the offense of murder. The appellate court summarized the evidence as follows:

> Testimony at trial established the following facts. Detective James Walters, then a police officer with the City of Port Neches, Texas, testified that he was dispatched to a Port Neches residence around 3:15 p.m. on the afternoon of November 20, 2007. When he arrived at the residence, two other officers were already present. Inside, the officers found the bruised and bloody nude body of Wayne Beavers lying face down on a bed. Beavers had apparently been beaten to death and strangled. There was a considerable amount of blood spatter throughout the house—"a very bloody crime scene." Most of the blood was dried, however, indicating to Detective Walters that it was "not a fresh crime scene." Appellant identified the victim as his roommate. During his investigation, Detective Walters was told that appellant and Beavers had a sexual relationship. Appellant acknowledged that Beavers was gay, but denied that he was involved in a sexual relationship with him. At the time of his death, Beavers was fifty-six years old; appellant was approximately thirty-three.
>
> The house where Beavers and appellant lived was filthy and in disarray. Trash, empty beer cans, and discarded pizza boxes were strewn about. Pill bottles were emptied out on a dresser. Beavers's cell phone—a "flip" phone—was found broken in half with the battery out on the bathroom floor near the toilet. DNA tests later determined that a mixture of Beavers's and appellant's blood was found on the cell phone. Appellant told Detective Walters that seven or eight months earlier, Beavers had suffered severe burns to his body due to an accident involving a fire in the barbecue pit.
>
> Later that evening, appellant was taken into custody on an unrelated warrant for possession of marijuana. Detective Walters interviewed appellant at the jail. During the interview, Detective Walters took several photographs of appellant's hands, which showed several cuts and abrasions that were consistent with having been in "a fight." Appellant also had scratch marks on his upper arms. Appellant explained that he had recently suffered the injuries to his hands while working on a house renovation. Appellant stated that he left for work around 7:00 a.m. on the morning of the 20th, and that Beavers was alive at that time. In the course of his investigation, Detective Walters learned that there were "a lot of people in and out of that house." During the interview, Detective Walters asked appellant about the nature of his relationship with Beavers, and appellant became "defensive." Detective Walters

identified the clothing that appellant was wearing on November 20th: black denim pants, a white t-shirt, white socks, and white tennis shoes. Samples from the clothing and swabs from the shoes were later submitted for analysis and testing.

Detective Walters learned from appellant that Jimmy Glenn Brown was one of the persons who had been around the house in the days prior to the murder. According to appellant, Brown had been at the house, but Beavers had asked him to leave. Appellant said Beavers dropped Brown off at a bar, but that Brown was arrested shortly after that for public intoxication. Brown was arrested on November 16, 2007, and was not released until around 10:00 a.m. on the morning of November 20. When Detective Walters talked to Brown, he noticed that Brown's hands had no cuts or bruises on them. Investigators concluded that if Brown committed the murder, he would had to have done so either before November 16 or during a five-hour window between 10:00 a.m. and 3:00 p.m. on November 20. Investigators therefore eliminated Brown as a suspect.

Michelle Smith, who was thirty-nine when Beavers was murdered, testified that she had been friends with Beavers since she was seventeen. Smith said that many friends had lived with Beavers over the years because "[h]e helped anyone that needed it." There were several people who lived at the house in 2007, including Donald Church and his girlfriend, Mike Church, and Jason Jimenez. On November 20, police came to Smith's home asking if she knew Brown. Smith said she did not know Brown. The police said that appellant had suggested that they look for Brown at Smith's house. Smith learned of Beavers's death by listening to the 10:00 p.m. news on the night of November 20. She went to Beavers's home and told Officer Robert Simon that she believed appellant had committed the crime. When Officer Simon asked her why she believed appellant was responsible, Smith said that appellant had tried to kill Beavers on a prior occasion by setting him on fire. Smith said that based on her knowledge as a friend of Beavers, appellant and Beavers had "a very violent relationship."

On cross-examination, Smith admitted that she had not witnessed the incident when Beavers was burned. She stated that there was a "revolving door" aspect to Beavers's house, with numerous friends and acquaintances coming and going.

Dr. Tommy J. Brown, then a forensic pathologist at the Jefferson County morgue, testified that he performed an autopsy on Beavers at 8:00 a.m. on November 21, 2007, the day after the body was discovered. Dr. Brown estimated the time of death as within twenty-four to thirty-six hours or less of the time of the autopsy. Dr. Brown stated that Beavers was apparently "stomped to death." Dr. Brown stated that Beavers's chest was crushed in, his skull was fractured from blunt force trauma, and he had been manually strangled—any or all of these could have caused his death. On cross-examination, Dr. Brown surmised that Beavers "might have been stomped to death, then maybe he was kicked in the head or stomped on the head ...."

Steve Mayes, a forensic scientist with the Jefferson County Crime Lab, testified that he participated in the gathering of evidence from the crime scene. Mayes identified various items that were collected and analyzed, including the pieces of the cell phone, appellant's tennis shoes (a pair of white Reeboks, size 6 ½), a pizza box with a bloody shoe impression on it, swabs from the bathroom sink and the kitchen sink, fingernail scrapings from Beavers, appellant's black jeans, and a red shirt and a tan shirt that belonged to Jimmy Brown.

Stacey Shettle, a lab technician with the Jefferson County Crime Lab, testified that she transported the evidence to the DPS crime lab in Houston. Fayth Davis, then a forensic scientist with the DPS Crime Lab in Houston, testified that she analyzed appellant's Reebok tennis shoe and compared it to the bloody imprint on the pizza box at the crime scene. Davis stated that the bloody imprint was made by appellant's shoe.

Andrew McWhorter, a forensic scientist from the DPS Crime Lab in Houston, testified that he prepared State's Exhibits 114 and 115, a "Serology/DNA Report" and "Supplemental Serology/DNA Report," respectively. McWhorter's findings in the "Serology/DNA Report" were as follows. Blood was found on the cell phone swabs, appellant's black jeans, white t-shirt, and shoes, swabs from the front bedroom door, bathroom faucet, and kitchen sink, and Jimmy Brown's red shirt and tan shirt. The DNA on appellant's black jeans and his white t-shirt was consistent with appellant's own DNA profile. A mixture of appellant's and Beavers's DNA was found on the cell phone, appellant's tennis shoe, and the scrapings from Beavers's fingernails. Jimmy Brown's red shirt and tan shirt contained a mixture of Beavers's DNA and that of an unknown individual; appellant was excluded as a contributor to that DNA profile. In the "Supplemental Serology/DNA Report," the following results were found: (1) appellant's DNA was found on the light switch to appellant's bedroom where the body was found; (2) Beavers's DNA was found in a swab from the right hallway wall; (3) a mixture of appellant's and Beavers's DNA was found in a swab from the right hallway wall, the hallway wall off the kitchen, the back bedroom door, and the outside bathroom door knob. A swab taken from the back door knob showed a mixture of DNA, appellant's and an unknown person.

On cross-examination, McWhorter agreed that if a person lives in a house, that person's DNA will be found in the house. At the conclusion of McWhorter's testimony, the State rested.

The defense presented the testimony of Dan Hellwig, the laboratory director of Sorenson Forensics, a private DNA testing laboratory. Hellwig testified that the red shirt belonging to Jimmy Brown contained a mixture of DNA that was Beavers's and an unknown individual's. The tan shirt that belonged to Jimmy Brown contained a

mixture of DNA that was Brown's and possibly Beavers's. The DNA from the tan shirt matched Brown's DNA profile via a DNA Database.

The defense next called Bradley Farr, who lived next door to appellant and Beavers in 2007. Farr testified that he was sitting on his front porch with his laptop on the afternoon of November 20, 2007. Appellant, who appeared to be "shook up," ran up and said he needed to use the phone to call 911 because "something bad" had happened to his roommate. Farr called 911. An audiotape of the call was introduced into evidence. Farr testified that appellant looked "buffed up" and was nervous. Farr noticed that appellant had a cut on his hand. Farr stated that a day or two earlier, a man had come to his door asking for Beavers. Farr said that the man was acting "kinda goofy" and that Farr "wanted him off [his] property."

Henry Russell Robin, appellant's father, testified that he is a truck driver and also does general carpentry and home repair work. Two of his sons, appellant and Thomas, do the same type of work and work with him. On the morning of November 20, 2007, he picked up appellant shortly after 7:00 a.m. and drove to a remodeling worksite in Vidor, Texas about thirty minutes away. When Henry arrived to pick up appellant, appellant was returning from a store across the road. Appellant had purchased a couple of beers for Beavers, as he did every morning. Appellant took the beers in the house and immediately came back out. Henry testified that he, Thomas, appellant, and a couple of other men worked on the site all day. He stated that appellant had cut his hand the day before on the job. Appellant often suffered minor cuts while working, and used black electrical tape or duct tape as a bandage. Around 10:00 a.m., appellant drove the truck to a nearby lumberyard to pick up some materials. He was gone about thirty-five to forty minutes. The police investigation revealed that the lumberyard and paperwork associated with the sale confirmed that appellant made the purchases at the stated time. Henry testified that blood was found on the passenger side of the truck where appellant sat. He stated that the blood likely came from the work-related cut on appellant's right hand. The owner of the house that they were working on came by the job site several times a day. Later that night, appellant called to tell him that he had found Beavers's body and that he was being questioned on unrelated charges.

Thomas Robin, appellant's brother, testified that appellant was working at the remodeling site on November 20, 2007. He stated that his hands and appellant's hands were frequently cut up because of the nature of the work they were performing. Arthur Martin testified that he owned a rental property and had hired Henry Robin to work on the property. He testified that he dropped in to check on the progress of the work on a daily basis. When he dropped by on the afternoon of November 20, 2007, Henry, Thomas and appellant were there. He stated they were "wrapping up" and planning to leave around 3:00 p.m.

5

Eddie Thomas Oliver III testified that he owned Spanky's Liquor Store in Port Neches, Texas from 2002 to December 2007. Beavers was a regular customer who came in five to six times a day, each time purchasing a single sixteen-ounce Busch beer. Appellant usually came into the store a couple of times per week. Oliver testified that he opened the store at 10:00 a.m. and Beavers was always his first or second customer. Oliver stated that on the morning of November 20, 2007, Beavers came in the store as usual shortly after 10:00 a.m. and bought a beer. Oliver did not see him again that day.

On cross-examination, Oliver stated that he had given a statement to the police stating that he had seen appellant that day between 10:15 a.m. and noon, but was not "a hundred percent sure" that it was the same day. In his statement to police, Oliver stated that he saw appellant twice that day, once before noon and again around 3:00 p.m. or so. Oliver testified that he was certain about Beavers being there, however, because "he was there every single day every single morning" "like clockwork."

Appellant testified that he grew up in Port Neches and dropped out of school in the tenth grade. He obtained a G.E.D. and did mechanic work and carpentry work. He met Beavers in December 2005 and moved into the house in early 2006. Appellant denied that he was involved in a sexual relationship with Beavers and stated that Beavers's sexual orientation was "about the only thing I didn't really care for him." There was no bed in Beavers's room; he slept on a recliner. Appellant stated the electricity worked in only a few places in the house: a couple of wall sockets in Beavers's room, one socket in appellant's room, and the bathroom; there was no electrical power in the kitchen. The front door of the house was inoperable; the only entry to the house was through the back door. Appellant stated that he did not know Michelle Smith, but knew "of her." He said that Michelle had heard that he set Beavers on fire from "people talking and drinking" and spreading rumors. He said that Michelle came around to visit Beavers maybe twice in the last year and a half. On one occasion, appellant said that Beavers sent him outside to tell Michelle that he was not home because she was always asking Beavers for money.

Appellant testified that Beavers suffered severe burns several months earlier due to an accident. Appellant was lighting some charcoal in the barbeque pit, but had trouble getting a fire started. He took gasoline from the lawnmower and put it into the bottle containing charcoal lighter fluid. The plastic top to the bottle was cracked. After starting the coals, appellant closed the lid to the pit and went to the store. When appellant returned, he saw Beavers standing next to the barbeque pit with a blanket around his shoulders. Beavers opened the pit and squirted gasoline on the coals. Some of the gasoline spilled onto the blanket, engulfing the blanket in flames. Appellant put the flames out and tried to get Beavers to go to the hospital immediately for treatment, but he refused. Beavers was treated at the hospital for the burns several days later.

6

Appellant stated that he did not own a cell phone; the only phone in the house was Beavers's cell phone. On a typical workday, appellant said his father picked him up to go to work around 7:00 or 7:30 a.m. Typically, Beavers was awake and drinking in his recliner. When he returned from work, appellant usually bought two beers at Spanky's, one for Beavers and one for himself. Appellant stated that he first met Jimmy Brown at Beavers's house.

On the morning of November 20, 2007, appellant's alarm clock did not go off. He was awakened when Beavers threw a shoe against the wall to wake him up. The shoe was appellant's, and he had to go into Beavers's room to retrieve it. Appellant stated that he wears a size nine or nine-and-a-half shoe. Appellant's shoes were in Beavers's room because he and Beavers had watched a movie and drank beer the night before. That morning, appellant helped Beavers get up out of the recliner and get to the restroom.

Appellant stated that Beavers did not eat much and "more or less lived off beer." On the morning of November 20, appellant picked up Beavers's cell phone to call his father, but the battery was dead. Appellant went to the Mobil store across the street, bought two beers and cigarettes for Beavers, and called his father. Appellant stated that the back door to the house was usually left open so the two dogs could go in and out of the house. Two days before the 20th, appellant had cut his thumb working on some flashing. During the workday on the 20th, the cut opened up several times and was bleeding on and off throughout the day.

Appellant stated that after working in Vidor, his father dropped him off at the house around 3:00 p.m. or so. Appellant heard the dogs barking inside the house, which was unusual; normally the dogs were outside in the back yard. The back patio door, which was usually left open, was closed and locked. Appellant opened the door with a key that was hidden nearby. The dogs seemed overly excited to be let out. Appellant put his tools down and went to Spanky's and bought two beers. Appellant set the beers down. Appellant noticed that when the dogs were jumping on him, his hand was "busted open again" and he could feel the blood running down his hand. He went to the bathroom sink to wash the blood off, then went into his bedroom because there was no towel in the bathroom. The room was dark, but he saw what appeared to be Beavers lying face down on the bed. He thought Beavers was passed out drunk, so he kicked the mattress a couple of times; Beavers did not move. He grabbed Beavers by the shoulder and noticed that he had blood all over the back of his head. Beavers felt "cold" and "wasn't moving at all." Appellant said he was "shocked" and looked for the phone in Beavers's room, but it was not there. Appellant had noticed Farr sitting on his front porch, so he ran next door and asked Farr to call 911. The 911 operator instructed appellant to go back in the house to determine if Beavers was still breathing. Appellant leaned over the bed, touched the body with his right hand, and determined that Beavers was not breathing. Appellant then went back to Farr's house.

>Soon, the police and paramedics arrived. When appellant left the house that morning, his pills were in pill bottles and the dresser drawers were in the dresser. After he found the body, he noticed the pills were spilled out and the drawers were pulled out and on the floor. When the officers arrived, appellant walked back in the house to show the officer the location of Beavers's body.
>
>On cross-examination, appellant stated that, at the time of the murder, only he and Beavers were living in the house. He stated that he did not approve of Beavers's homosexual lifestyle. Appellant said that Beavers slept most of the day and drank most of the night. According to appellant, there were people in and out of the house all the time, and he did not know most of them. Appellant explained that the story that he had set Beavers on fire got started when there were four or five people at the house drinking. Someone joked that appellant set Beavers on fire because Beavers "made a move" on appellant, which angered appellant. According to appellant, everyone knew that it was a joke. Appellant said that the blood on his t-shirt that day was his own blood from his cut hand. Appellant initially disputed that the white size six-and-a-half shoes without laces were his, insisting that he wears a size nine-and-a-half and that the shoes he wore that day had laces. After the prosecutor pointed out that the shoes had paint stains on them, appellant admitted that they were probably his shoes. The prosecutor noted that the shoe print matched the impression on the pizza box. Appellant agreed with the prosecutor that the impression on the pizza box could only have been made when the blood was still wet. Appellant responded that his hand was bleeding so much, it could have been his blood that was responsible for the shoeprint on the pizza box. When asked about the swelling and bruising on his hands, appellant said the bruises were caused by rubbing up against a wall at work and rubbing against brick. Appellant denied that he was involved in any way with Beavers's murder.

*Robin v. State*, No. 13-14-00218-CR, 2015 WL 2452712, at *1–6 (Tex. App.–Corpus Christi May 21, 2015, pet. ref'd).  The Thirteenth Court of Appeals found the evidence was sufficient to support Petitioner's conviction for murder, modified the judgment to reflect that the offense was a first degree felony, and affirmed the judgment as modified.

Petitioner filed a state application for habeas relief, asserting that his attorney failed to timely notify him that his conviction had been affirmed.  The Texas Court of Criminal Appeals granted relief allowing Petitioner to file an out-of-time petition for discretionary review.  (ECF No. 17-15

at 1; ECF No. 17-17 at 1-2.) Petitioner filed a petition for discretionary review, which the Texas Court of Criminal Appeals refused.

Petitioner filed a second state application for habeas relief. On January 8, 2020, the Texas Court of Criminal Appeals denied the application without written order on the findings of the trial court without hearing and on the court's independent review of the record. (ECF No. 17-20 at 1.)

## The Petition

Petitioner contends that he received ineffective assistance of counsel because trial counsel: (1) improperly advised Petitioner that he was charged with a second degree felony, which only has a sentence range of 2-20 years of imprisonment; and (2) failed to subpoena Detective Fornet to testify regarding the crime scene. Petitioner claims he was denied a speedy trial. Finally, Petitioner contends the trial court erred by allowing the State to amend the indictment to allege a first degree felony without leave of court or notice to Petitioner.

## Standard of Review

Title 28 U.S.C. § 2254 authorizes the district court to entertain a petition for writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment if the prisoner is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). The court may not grant relief on any claim that was adjudicated in state court proceedings unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States;[1] or (2) resulted in a decision based on an unreasonable determination of the facts in light of

---

[1] In making this determination, federal courts may consider only the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

the evidence presented in the state court. 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if the state court reaches a conclusion opposite to a decision reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). An application of clearly established federal law is unreasonable if the state court identifies the correct governing legal principle, but unreasonably applies that principle to the facts. *Id*. State court decisions must be given the benefit of the doubt. *Renico v. Lett*, 559 U.S. 766, 773 (2010).

The question for federal review is not whether the state court decision was incorrect, but whether it was unreasonable, which is a substantially higher threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). If the decision of the highest state court is not accompanied by an explanation of the court's reasoning, federal courts must look to the last state court decision that does provide an explanation for the decision. *Wilson v. Sellers*, _ U.S. _ , 138 S. Ct. 1188, 1192 (2018). There is a rebuttable presumption that the unexplained ruling adopted the same reasoning. *Id*. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011); *see also Johnson v. Williams*, 568 U.S. 289, 293 (2013) (holding there is a rebuttable presumption that the federal claim was adjudicated on the merits when the state court addresses some claims, but not others, in its opinion).

This court must accept as correct any factual determinations made by the state courts unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). The presumption of correctness applies to both implicit and explicit factual findings. *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 948 n. 11 (5th

Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."). Deference to the factual findings of a state court is not dependent upon the quality of the state court's evidentiary hearing. *See Valdez*, 274 F.3d at 951 (holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review.").

## Analysis

### I. Ineffective Assistance of Counsel

Petitioner alleges that he was denied the effective assistance of counsel. In order to establish an ineffective assistance of counsel claim, Petitioner must prove counsel's performance was deficient and the deficient performance prejudiced Petitioner's defense. *Strickland v. Washington*, 466 U.S. 668 (1984). Because Petitioner must prove both deficient performance and prejudice, failure to prove either will be fatal to his claim. *Johnson v. Scott*, 68 F.3d 106, 109 (5th Cir. 1995).

Judicial review of counsel's performance is highly deferential. *Strickland*, 466 U.S. at 689. There is a strong presumption that counsel rendered reasonable, professional assistance and that the challenged conduct was the result of a reasoned strategy. *Id*. To overcome the presumption that counsel provided reasonably effective assistance, Petitioner must prove his attorney's performance was objectively unreasonable in light of the facts of Petitioner's case, viewed as of the time of the attorney's conduct. *Id*. at 689-90. A reasonable professional judgment to pursue a certain strategy should not be second-guessed. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).

In addition to demonstrating counsel's performance was deficient, Petitioner must also show prejudice resulting from counsel's inadequate performance. *Strickland*, 466 U.S. at 691-92.

11

Petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Petitioner must show a substantial likelihood that the result would have been different if counsel performed competently. *Richter*, 562 U.S. at 112. To determine whether Petitioner was prejudiced, the court must consider the totality of the evidence before the fact-finder. *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010).

Analysis of an ineffective assistance claim on federal habeas review of a state court conviction is not the same as adjudicating the claim on direct review of a federal conviction. *Richter*, 562 U.S. at 101. The key question on habeas review is not whether counsel's performance fell below the *Strickland* standard, but whether the state court's application of *Strickland* was unreasonable. *Id*. Even if Petitioner has a strong case for granting relief, that does not mean the state court was unreasonable in denying relief. *Id*. at 102.

    A.  *Providing Erroneous Advice*

Petitioner claims that his trial counsel provided ineffective assistance by advising him that he was charged with a second degree felony, with a maximum sentence exposure of twenty years of imprisonment. Petitioner alleges that he rejected the State's plea offer calling for a twenty year sentence because he mistakenly believed that twenty years was the maximum sentence that could be imposed if he went to trial and was convicted.

Petitioner raised these allegations in his state application for habeas relief. The trial court found that the heading of the indictment contained a clerical error designating the offense as a second degree felony, but the indictment "clearly and concisely charged application with the First-Degree

Felony offense of Murder pursuant to Texas Penal Code 19.02(b)(2)." (ECF No. 17-22 at 50.) The trial court found that trial counsel's affidavit, submitted in response to Petitioner's allegations, was credible and truthful. (ECF No. 17-22 at 52.) Additionally, the court made the following findings:

> 22. [T]his Court first finds that at no time did [trial counsel] ever advise applicant that the confinement-period for the underlying Murder charge was that of a second-degree felony, 2 to 20 years' in the penitentiary; and, that said allegation is not credible and is unsupported in the habeas record.
>
> 23. To the contrary, this Court finds that during the course of representing applicant, [trial counsel] advised him of the correct confinement-period for Murder, that being from 5 to 99 years' or life in the penitentiary.
>
> 24. With respect to a purported plea-bargain offer from the State for twenty years' confinement in exchange for applicant pleading guilty to Murder, this Court finds said allegation is incredible and not supported in the habeas record.
>
> 25. To the contrary, although [trial counsel] states that applicant's file was destroyed in weather-related flooding-events over the past five years, which this Court finds credible, [trial counsel] indicates he has no recollection of any plea-bargain offers from the State, and also states that had there been such a plea-bargain offer, he would have advised applicant of it; however, as [trial counsel] emphasizes, "Mr. Robin <u>always</u> asserted his innocence." [emphasis by Mr. Makin]
>
> 26. This Court finds the lack of any plea-bargain offer and applicant's constant insistence of his innocence is supported by the defense-strategy undertaken in applicant's trial, which essentially was that of alibi.
>
> 27. This Court finds no credible evidence in the habeas record to support applicant's claim that [trial counsel] erroneously advised him to reject any plea-bargain offer from the State and "to proceed to trial[;]" [trial counsel] responds that "[a]t all times I advised Mr. Robin whether to plead or go to trial was his choice[,]" and this Court finds this to be credible as the instant habeas record suggests that applicant had always insisted on his innocence and had prepared for trial with testimony from both expert and fact-witnesses, including himself, to the effect that the victim was murdered during the time applicant was at work.

(ECF No. 17-22 at 52-54.)

This court must accept the state court's findings of fact as correct, unless Petitioner rebuts the presumption of correctness by clear and convincing evidence. Petitioner relies on the indictment and judgment with the erroneous headings as evidence supporting his claim. However, those documents are insufficient to prove, by clear and convincing evidence, that defense counsel erroneously advised him that Petitioner was charged with a second degree felony with a sentence exposure of 2-20 years, and advised Petitioner to reject a plea agreement for a 20-year sentence. Based on the factual findings of the state court, counsel did not perform deficiently. Nor has Petitioner demonstrated that he was prejudiced by counsel's advice regarding the indictment and Petitioner's sentence exposure. Thus, the state court's application of *Strickland* was reasonable, and Petitioner is not entitled to relief on this ground.

### B. Failing to Subpoena a Witness to Testify

Petitioner contends his attorney should have called Detective Fornet to testify that the blood from the victim's head wounds was seeping into the pillow when he arrived on the scene. Petitioner contends that Detective Fornet's testimony would have contradicted the testimony of Detective James Walter that the crime scene was not fresh and most of the blood was dried, and it would have supported Petitioner's defense that the murder took place after Petitioner left the home that morning.

Complaints about the failure to call witnesses are disfavored in habeas petitions because allegations of potential testimony are largely speculative, and the presentation of witnesses is generally a matter of trial strategy. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986). Petitioner must identify the witness, explain the content of the witness's proposed testimony, show that the testimony would have been favorable to a particular defense, and demonstrate that the witness would have testified at trial. *Day*, 566 F.3d

14

at 538. Generally, relief will not be granted where the only evidence of the potential witness's testimony comes from the petitioner. *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001).

The state trial court addressed this issue during the state habeas proceedings, and made the following findings:

> 32. With regard to counsel's "failure" to call Detective Fornet as a defense witness, in his affidavit, [trial counsel] recalls that he spoke to Detective Fornet, and that, after speaking with him, [trial counsel] made what appears to be a definitive strategic decision that he was "not" calling Fornet as a defense witness. [emphasis by Mr. Makin]
>
> 33. The trial record also indicates that the jury was provided with approximately twenty-six crime-scene photographs depicting the victim's appearance and areas with the victim's mobile home where blood-spatter was discovered; and, were provided with photographs of applicant's hands taken by Detective Walters on the day the victim's body was discovered which depicted "several cuts and abrasions that were consistent with having been in 'a fight.'"

(ECF No. 17-22 at 55.) Based on trial counsel's affidavit and the trial record, the trial court concluded that Petitioner had failed to establish that counsel performed deficiently, or that Petitioner was prejudiced by counsel's failure to call Detective Fornet to testify. (ECF No. 17-22 at 56.)

Petitioner's assertion that Detective Fornet's testimony would have been favorable to the defense is speculative. Petitioner's unsupported allegations regarding an uncalled witness are insufficient to overcome the strong presumption that counsel provided effective assistance of counsel, or to demonstrate that he was prejudiced by counsel's failure to present testimony from Detective Fornet. Therefore, the state court's rejection of this claim is not contrary to, and does not involve an unreasonable application of, clearly established federal law. Nor did the state court's findings result in a decision based on an unreasonable determination of the facts in light of the evidence.

*II. Procedural Bar*

Petitioner contends that he was denied the right to a speedy trial. Petitioner did not assert his right to a speedy trial until he filed his second state habeas application. During the state habeas proceedings, the trial court found that the speedy trial claim was procedurally forfeited. (ECF No. 17-22 at 57.)

Federal habeas review of a claim is procedurally barred if the last state court to consider the claim rejected it based on an adequate and independent state procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Brewer v. Quarterman*, 466 F.3d 344, 346-47 (5th Cir. 2006). The state court's dismissal must clearly and expressly state that it rests on a state bar to relief, and the bar must be strictly or regularly enforced by the state courts. *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012). In this case, the trial court found that Petitioner did not assert his right to a speedy trial and obtain a ruling from the trial court, and he was procedurally barred from raising the issue on collateral review. (ECF No. 17-22 at 57.) The trial court expressly stated that habeas review was barred based on the state procedural rules established by *Ex parte Jimenez* and *Ex parte Cruzata*. *See Ex parte Jimenez*, 364 S.W.3d 866, 881 (Tex. Crim. App. 2012) (holding that record based claims must be raised and receive a ruling prior to trial); *Ex parte Cruzata*, 220 S.W.3d 518, 520 (Tex. Crim. App. 2007) (holding that claims that could have been raised on direct appeal cannot be raised for the first time in an application for habeas corpus). The Fifth Circuit has found that the failure to comply with Texas' contemporaneous objection rule is an adequate and independent state procedural ground to bar federal habeas review. *Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007). In addition, the Fifth Circuit has held that the Texas rule prohibiting collateral review

of claims that could have been raised on direct appeal is an independent and adequate rule that bars federal habeas relief. *Aguilar v. Dretke*, 428 F.3d 526, 535 (5th Cir. 2005).

Because the last state court to expressly address Petitioner's speedy trial claim found that it was defaulted based on firmly-established and regularly-followed state procedural rules, Petitioner may not raise the claim in a federal habeas proceeding, unless he demonstrates cause for the default and prejudice from a violation of federal law. *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *Canales v. Stephens*, 765 F.3d 551, 562 (2014). Petitioner has not met this burden. Therefore, his speedy trial claim is barred from federal habeas review.

*IV. Amendment of Indictment*

Petitioner contends that the trial court erred by allowing the State to amend the indictment to reflect that the murder charge was a first degree felony without providing notice to Petitioner or obtaining leave of court. These claims were raised, and rejected, during the state habeas proceedings. The trial court found that the facts alleged in the indictment alleged the first degree offense of murder, and the indictment was not amended. (ECF No. 17-22 at 46.) The trial court found that there was a clerical error in the caption of the indictment and on the face of the judgment, but noted that the caption is not part of the indictment. (ECF No. 17-22 at 50-51.) The trial court also found the following:

> 17. Applicant has not provided the Court with any proof, credible or otherwise, that the indictment-caption's clerical error designating the offense as a second-degree felony prejudiced him or his defense in any way, other than the incredible and self-serving allegations he pleads in the instant habeas application and legal memorandum.
>
> 18. This Court finds the formal portion of the underlying indictment follows the prescribed statutory language, and concludes that the clerical-error in the

>indictment's caption does not amount to a jurisdictional defect, nor does it present a violation of applicant's constitutional or fundamental rights.

(ECF No. 17-22 at 51.)

The trial court's determinations regarding an indictment are matters of state law. *McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994). Federal courts will not review a state court's interpretation of its own state law in a federal habeas proceeding. *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991). Nor do federal courts "sit as a super state supreme court in such a proceeding to review errors under state law." *Id.* (internal quotes omitted); *see also Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983) ("It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law."). Therefore, Petitioner is not entitled to relief on this ground.

## Recommendation

This petition for writ of habeas corpus should be denied.

## Objections

Within fourteen days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings of facts, conclusions of law and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Failure to file written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within fourteen days after service shall bar an aggrieved party from the entitlement of *de novo* review by the district court of the proposed findings, conclusions and recommendations and from appellate review of the factual findings and legal conclusions accepted by the district court, except on grounds of plain error. *Douglass v. United*

*Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72.

SIGNED this 18th day of July, 2023.

　　　　　　　　　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　　　　　　　　　Zack Hawthorn
　　　　　　　　　　　　　　　　　　United States Magistrate Judge